FILED'10 JUN 29 10:21 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

TERRY PAPENFUS,

        Petitioner,

    v.

JEAN HILL,

        Respondent.

Civil No. 06-885-JE

FINDINGS AND RECOMMENDATION

Tonia L. Moro
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

    Attorney for Petitioner

John R. Kroger
Attorney General
Jacqueline Kamins
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

    Attorneys for Respondent

1 - FINDINGS AND RECOMMENDATION

JELDERKS, Magistrate Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 in which he seeks to challenge the legality of his underlying state court convictions for Rape and Sex Abuse of his stepdaughter. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#61) should be denied.

## BACKGROUND

In February 1995, petitioner's stepdaughter ("JL") had a group of friends over for a slumber party. Afterward, four of JL's friends accused petitioner of sexual abuse. Within a few days, three other friends claimed that petitioner had abused them two years earlier. Trial Transcript, p. 143.

During the course of the investigation into these claims, JL told the investigating officer that she was not aware of the alleged abuse, and had not been abused by petitioner. *Id* at 421, 844. She also gave a videotaped interview denying that petitioner had ever abused her.

When petitioner's original case involving JL's friends proceeded to trial in 1996, JL testified that she was unaware of the abuse and that petitioner was never violent to her. *Id* at 138, 142, 863. The jury convicted petitioner of two counts, and hung on or acquitted him of the remaining three counts. *Id* at 11, 99. As a result, petitioner was sentenced to concurrent sentences of 18 and 22 months, respectively. Respondent's Exhibit 101.

While petitioner was incarcerated, JL disclosed to her mother that petitioner had, in fact, repeatedly abused her over a period of two years.  JL explained that she did not disclose the abuse earlier because she was afraid of petitioner, and did not think her mother would believe her.  *Id* at 769, 805.  In fact, when JL directed her mother to her diary as evidence of the abuse, her mother tore out the pages.  *Id* at 681, 822.  Eventually, JL and her mother talked to a pastor, and the pastor contacted the police.  It is this abuse of JL which is the subject of this federal habeas corpus action.

The abuse began when JL's mother was in Kansas visiting her sister.  During that time, petitioner forced JL to have sexual intercourse with him.  *Id* at 767-68, 773-74.  Petitioner then called JL's mother in Kansas to tell her that JL had injured her vagina in a fall.  *Id* at 673, 780.  The abuse continued, and petitioner told JL's mother that "he was in love with [her] daughter."  Id at 675-76.  JL expressed concern to petitioner that she might become pregnant, apparently prompting petitioner to verify with JL's mother that JL was, in fact, capable of becoming pregnant.  *Id* at 678.

At petitioner's 1998 trial, JL testified that she was molested and raped frequently, sometimes on a weekly basis.  *Id* at 795, 804.  A pediatrician who examined JL concluded that her hymen was ripped in two places and scarred, and while this could be a "normal

3 - FINDINGS AND RECOMMENDATION

variation," it was also consistent with penetrating trauma. *Id* at 586-88, 601, 608.

Absent from the trial, however, was the 1995 videotaped interview of JL from the previous investigation involving her friends where she had denied that petitioner had ever abused her. The tape had been destroyed, prompting the defense to move to dismiss the indictment. The trial judge denied the motion, finding that the destruction of the tape was not intentional or done in bad faith. *Id* at 374-75.

The jury ultimately convicted petitioner of two counts of Sex Abuse in the First Degree and one count of Rape in the First Degree. Respondent's Exhibit 101. The trial court sentenced petitioner to consecutive sentences totaling 166 months in prison. *Id* at 1115-1117.

Petitioner took a direct appeal, but the Oregon Court of Appeals affirmed the trial court without opinion, and the Oregon Supreme Court denied review. Respondent's Exhibits 107, 108.

Petitioner next filed for post-conviction relief ("PCR") in Malheur County where the PCR trial court denied relief on his Petition. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. Respondent's Exhibits 127, 127.

In his Amended Petition for Writ of Habeas Corpus, petitioner raises 25 grounds for relief, but focuses his briefing on two claims:

> 2.   The trial court denied petitioner his Fourteenth Amendment right to due process when it denied his pretrial motion to dismiss based upon the State's destruction of JL's videotaped interview in support of petitioner pertaining to the sexual abuse alleged by her friends; and
>
> 3.   Petitioner was denied his Fourteenth Amendment right to Due Process and Fifth and Sixth Amendment trial rights when the trial court erred in denying petitioner's repeated motions for a new trial.

Respondent asks the court to deny relief on the Amended Petition because: (1) the unargued claims do not entitle petitioner to relief; (2) Ground Two was not fairly presented to the state courts and is now procedurally defaulted; and (3) both Grounds One and Two were properly denied by the state courts in decisions that are entitled to deference.

### DISCUSSION

## I.   Unargued Claims

As previously mentioned, there are a number of claims in the Amended Petition which petitioner has not briefed. Petitioner has not carried his burden of proof with respect to these unargued claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (petitioner bears the burden of proving his claims). Even if petitioner had briefed the merits of these claims, the court has

examined them based upon the existing record and determined that they do not entitle him to relief.

## II.   __Exhaustion and Procedural Default__

Respondent argues that petitioner's Ground Two due process claim was not fairly presented to Oregon's state courts because he did not identify his claim as a federal one.

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'" *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, (1986)). If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or

6 - FINDINGS AND RECOMMENDATION

failed to raise the claim at the state level at all.  *Edwards v.
Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S.
722, 750 (1991).  If a petitioner has procedurally defaulted a
claim in state court, a federal court will not review the claim
unless the petitioner shows "cause and prejudice" for the failure
to present the constitutional issue to the state court, or makes a
colorable showing of actual innocence.  *Gray v. Netherland*, 518
U.S. 152, 162 (1996); *Sawyer v. Whitley*, 505 U.S. 333, 337 (1992);
*Murray v. Carrier*, 477 U.S. 478, 485 (1986).

In his Appellant's Brief and Petition for Review, petitioner
alleged that the trial court's refusal to grant him a mistrial
constituted an abuse of discretion in violation of Oregon law.
Petitioner did not indicate that he sought to raise a federal due
process claim at all.  Instead of citing to federal cases or the
federal Constitution, petitioner cited exclusively to Oregon state
law.  Respondent's Exhibits 104, 106.

Petitioner does not contend that he explicitly raised a
federal constitutional claim in Oregon's state courts.  Rather, he
asserts that the Oregon Constitution lacks an independent due
process clause, so the argument he raised in his Appellant's Brief
and in his Petition for Review, while predicated entirely on state
law, must also constitute a federal due process claim by
implication.

7 - FINDINGS AND RECOMMENDATION

It is difficult to conclude that a state-law abuse of discretion claim automatically raises a federal due process claim in the absence of any citation to federal authority. Under petitioner's theory of fair presentation, any claim of trial court error presented to Oregon's state courts automatically includes a federal due process claim not only where the litigant fails to cite any federal authority, but also where he fails to inform the state courts that his claim implicates due process.[1] The court finds no support for this position in the case law. To the contrary, it is a litigant's responsibility to explicitly raise a federal constitutional claim within the four corners of his briefing. *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005). Accordingly, petitioner failed to fairly present his due process claim to Oregon's state courts. As he can no longer do so, the claim is procedurally defaulted. Petitioner does not argue cause and prejudice, nor does he attempt to make a colorable showing of actual innocence sufficient to excuse his default.

///

_____

[1] It is noteworthy that with respect to petitioner's Ground Three claim, he alerted the state courts that the destruction of evidence "violated defendant's rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution" and cited a U.S. Supreme Court decision. Petitioner's explicit reference to the federal Due Process Clause and federal case law undermines his argument that he believes that all claims of trial court error in Oregon automatically invoke the federal Due Process Clause.

## III. **The Merits**

### A.   **Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires

9 - FINDINGS AND RECOMMENDATION

the state court decision to be more than incorrect or erroneous. *Id* at 410. The state court's application of clearly established law must be objectively unreasonable. *Id* at 409.

**B.  <u>Analysis</u>**

In petitioner's final remaining claim, he asserts that the State violated his right to due process when it destroyed exculpatory evidence in the form of JL's 1995 videotaped interview wherein she denied that petitioner abused her.

The State violates a defendant's right to due process if it destroys materially exculpatory evidence, irrespective of the good or bad faith of the prosecution. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004). Where the destroyed evidence was only *potentially* exculpatory, a criminal defendant must show that the "exculpatory value [] was apparent before the evidence was destroyed, and was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Where potentially exculpatory evidence is at issue, unless petitioner "can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). A finding of bad faith depends upon the State actor's knowledge of the exculpatory value of the evidence at the time of its

destruction. *Id* at 56-58. Mere negligence does not constitute bad faith. *Id* at 58.

In this case, JL's interview with respect to petitioner's first prosecution took place on February 27, 1995. Trial Transcript, pp. 310, 313. In January of 1997, the Children's Advocacy Center asked Detective Johnson at the Medford Police Department for authorization to destroy the tape or, alternatively, a request to preserve it for additional time. *Id* at 315. At that time, it was not protocol to send such requests to the district attorney's office for approval. *Id* at 315, 333. Detective Johnson returned the paperwork to the Children's Advocacy Center in February of 1997, authorizing the destruction of the 1995 JL interview. In reaching this decision, Detective Johnson reasoned as follows:

> I knew that a prior case where [JL] was involved and some others had been to trial, that it was a done trial, ultimately past what I would be concerned with, and that she never made any disclosure of any criminal activity. I saw no sense in keeping it. I told them to erase it.

*Id* at 334. At the time Detective Johnson authorized the destruction of JL's 1995 interview tape, he was not yet aware of any allegations against petitioner by JL. *Id* at 334-336.

Detective Johnson believed that the people at the Children's Advocacy Center tasked with destroying the tape would do so immediately, but the tape was not actually destroyed until April 8, 1997. *Id* at 311, 320, 336. When asked why he did not take any

11 - FINDINGS AND RECOMMENDATION

steps to preserve the tape after he found out about the new criminal allegations involving petitioner and JL in February of 1997, Detective Johnson responded, "I just didn't connect it . . . It just didn't enter my mind." *Id* at 342.

The defense moved to dismiss the case, arguing that it would be inappropriate for the State to be able to benefit from the destruction of exculpatory evidence which could have been prevented if the State and its various agencies had simply communicated with each other. *Id* at 368. While the defense acknowledged that the content of the 1995 interview could come in through witness testimony, it was concerned that the witnesses to that interview were more sympathetic to the prosecution and, more importantly, that the demeanor of JL during her interview was lost in a case which would principally be resolved on her credibility. *Id* at 370. The trial court ruled as follows:

> Well, as I said before, I don't believe that the issue of bad faith is really an issue here, and I still don't think that. But for purposes of the record, I do find that this was not an intentional act on the State's part. It was not in bad faith. I would characterize it more as being the left hand not knowing what the right hand was doing, and negligence, quite frankly, in what occurred in the procedures and I would trust and hope that the procedures that were involved in this case would be reexamined in light of what has come up today. But that's not my role to do that, and I also do not believe it's necessary for purposes of this case for me to make a decision about whether the Children's Advocacy Center is an agent of the State. I think that's also an issue for another day. The State has already conceded that in essence the tape was destroyed by and pursuant to the actions of an agent of the State, Detective Johnson, so

12 - FINDINGS AND RECOMMENDATION

I don't think I need to go beyond that.  That's just where we are.

It did occur to me that what we're really talking about here is not the destruction of evidence. There is still evidence of what was said in that first interview. Instead, what we're talking about is that the form of that evidence that the Defense thinks they would prefer has been destroyed, but we still have the evidence of what was said in that first interview and the fact that the alleged victim denied at that point that she had been sexually abused by [petitioner], and the Defense is presuming that the demeanor that would be shown on that first videotape would be exculpatory.  There has been no showing, really, that that's the case, that the demeanor would have been shown on that video would have been exculpatory.  I have no idea what it would have shown. It could have shown the opposite.   And there are witnesses who are available.

I understand what the Defense is saying about their position that these witnesses are somewhat biased in favor of the State.  However, the Defense will have ample opportunity to cross-examine them, to make a point of the destruction of this tape in front of the jury, and certainly, if requested and it may be -- I haven't gotten to the requested jury instructions -- I would give a less satisfactory evidence instruction.

So based on what I have just said, I'm denying the motion, and we'll proceed with trial.

*Id* at 374-376.

Petitioner first asserts that JL's 1995 interview tape was materially exculpatory, thus the trial court should have granted his motion to dismiss the indictment.  According to petitioner, JL's demeanor during the 1995 interview in which she adamantly denied that petitioner abused her was, itself, exculpatory.  She came across as angry, repeatedly denied that she was abused, and denied that petitioner was ever violent towards her.   Trial

Transcript, pp. 352-353, 414, 417, 433-434. Petitioner contends that because the tape was materially exculpatory, he need not demonstrate bad faith in order to prevail on his due process claim.

Although petitioner focuses on the demeanor of JL during the 1995 interview as materially exculpatory evidence by itself, the jury's inability to see JL's demeanor during the 1995 interview does not convert the undisputed information conveyed during the interview into materially exculpatory evidence. During the criminal trial, JL testified that she denied the abuse because, "If I told, I knew I would have to go home to [petitioner]" who had always threatened to hurt her or her family if she disclosed the abuse. *Id* at 813, 805. JL was angry about the whole situation because, "I couldn't tell. It wasn't fair to me. . . ." *Id* at 810. She testified that she was not angry with her friends who disclosed their own abuse, "but that they could tell and have people believe them." *Id*. In this way, her anger in the 1995 interview, as enlightened by her 1997 testimony, could have worked against petitioner (as noted by the criminal trial court). Because petitioner cannot show that the outcome of his trial would likely have been different had the jury seen the 1995 interview in lieu of the witness testimony regarding the tape's content, the court should not conclude that the videotape was clearly exculpatory.

Having determined that the 1995 evidence was not materially exculpatory, the court turns to petitioner's alternative argument

14 - FINDINGS AND RECOMMENDATION

that the state destroyed the videotape in bad faith.  Specifically, petitioner faults Detective Johnson for not doing anything to prevent the destruction of the videotape (which occurred on April 8, 1997) once he first became aware of the new accusations against petitioner in February of 1997.

The court finds that the criminal trial court was correct in determining that the destruction of the videotape was due to a failure to communicate. At the time Detective Johnson approved destruction of the tape, he had no idea that there were new accusations against petitioner and, thus, did not know of the potentially exculpatory value of the tape.  He reasonably viewed the evidence as applying to the 1996 trial for which it was developed, and there was no reason to continue to maintain the videotape for the 1995-1996 investigation and prosecution, both of which had reached an end.

It is also important to note that while Detective Johnson's decision regarding the 1995 videotape is put under a microscope in this case, that was only one of "at least a hundred or better" videotapes which the Children's Advocacy Center asked him to evaluate in that single request, a request which took him at least two to three weeks to complete. *Id* at 337, 333.  The fact that he did not recall JL's specific entry from the long request list when he heard that there were new accusations, while unfortunate, certainly does not rise to the level of bad faith.  At worst, the

15 - FINDINGS AND RECOMMENDATION

conduct amounted to negligence, but such conduct does not arise to the level of bad faith. *Youngblood*, *supra*.

Even assuming Detective Johnson had acted in bad faith when he approved the destruction of the videotape evidence, petitioner would be unable to prevail on his due process claim because comparable evidence to the 1995 videotaped interview existed and was introduced at the 1998 trial when individuals who witnessed that interview, as well as JL who actually gave the interview, testified as to its content. As previously noted, it was plainly brought out at trial that JL had adamantly stated in a 1995 interview that petitioner had not sexually or physically abused her.

For all of these reasons, the state court decisions denying plaintiff's due process claim are neither contrary to, nor unreasonable applications of, clearly established federal law.

<u>**RECOMMENDATION**</u>

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (#61) should be denied and a judgment should be entered dismissing this case with prejudice. The court should decline to issue a Certificate of Appealability on the basis that petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

///

///

16 - FINDINGS AND RECOMMENDATION

**SCHEDULING ORDER**

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections. Failure to timely file objections to any factual determination(s) of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issue(s), and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this ___21___ day of June, 2010.

_____
John Jelderks
United States Magistrate Judge

17 - FINDINGS AND RECOMMENDATION